IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BLAKE and JENNA MILLER, individually and on behalf of C.M., A MINOR CHILD, | § § § § | |
| Plaintiffs | § § § | |
| vs. | § § | NO. 4:19-CV-2072 |
| UNITED STATES OF AMERICA, | § § § § | |
| Defendant | § § | |

**PLAINTIFFS' ORIGINAL COMPLAINT**

Plaintiffs Blake and Jenna Miller, individually and on behalf of C.M., a Minor Child, bring this complaint under the Federal Tort Claims Act, 28 U.S.C. § 2674. Plaintiffs complain of the United States of America and would respectfully show the following:

**I. PARTIES**

1.1. This is a medical malpractice case.

1.2. Plaintiffs Blake Miller, Jenna Miller, and C.M. live in Conroe, Texas. Blake and Jenna Miller are the natural and biological parents of C.M.

1.3. Plaintiffs live within the Southern District of Texas, subject to the Court's jurisdiction.

1.4.    The Defendant is the United States of America, its officers, agents, employees, and representatives.

## II. JURISDICTION, SERVICE, AND VENUE

2.1.    This Federal District Court has subject-matter jurisdiction because this action is brought pursuant to and in compliance with 28 U.S.C. §§ 1346(b), 2671–80, commonly known as the Federal Tort Claims Act, which vests exclusive subject-matter jurisdiction of the Federal Tort Claims Act in Federal District Court.

2.2.    The United States of America may be served with process in accordance with Rule 4(i) of the Federal Rules of Civil Procedure by serving a copy of the Summons and Complaint on United States Attorney Ryan K. Patrick, United States Attorney for the Southern District of Texas by certified mail, return receipt requested at his office:

> U.S. Attorney's Office Southern District of Texas
> Attn: Civil Process Clerk
> 1000 Louisiana, Ste. 2300
> Houston, TX 77002

2.3.    Service is also affected by serving a copy of the Summons and Complaint on William Barr, Attorney General of the United States, by certified mail, return receipt requested at:

> The Attorney General's Office
> U.S. Department of Justice
> ATTN: Civil Process Clerk
> 950 Pennsylvania Avenue, NW
> Washington, DC 20530-0001

2.4. Venue is proper in this district pursuant to 28 U.S.C. § 1402(b) because the United States is a Defendant, and Plaintiffs reside in this judicial district.

### III. LIABILITY OF THE UNITED STATES

3.1. This case is commenced and prosecuted against the United States of America in compliance with Title 28 U.S.C. §§ 2671–80, the Federal Tort Claims Act. Liability of the United States is predicated specifically on 28 U.S.C. § 2674 because the personal injuries and resulting damages for which the complaint is made were proximately caused by the negligence, wrongful acts, or omissions of employees or agents of the United States of America working at the Mike O'Callaghan Military Medical Center at Nellis Air Force Base, Nevada, while acting within the scope of their office, employment, or agency under circumstances where the United States of America, if a private person, would be liable to the Plaintiffs in the same manner and to the same extent as a private individual.

3.2. The substantive law of the State of Nevada applies to this lawsuit.

3.3. The Department of the Air Force is an agency of the United States of America.

3.4. The Defendant United States of America, through its agency, the Department of the Air Force, at all material times owned, operated, and controlled the Mike O'Callaghan Military Medical Center at Nellis Air Force Base, Nevada, and staffed its facilities with its agents, servants, and employees.

3.5. At all material times, all persons involved in the medical and health care services provided to Plaintiffs Jenna Miller and C.M. at the Mike O'Callaghan Military Medical Center, Nellis Air Force Base, Nevada were agents, servants, or employees of the

Department of the Air Force, the United States of America, or some agency thereof, and were at all material times acting within the course and scope of such employment.

## IV. JURISDICTIONAL PREREQUISITES

4.1.    Plaintiffs plead pursuant to 28 U.S.C. §§ 2672 and 2675(a) that the claims set forth meet all jurisdictional prerequisites, including timely administrative presentment.

4.2.    The claims set forth in this complaint were delivered to the Department of the Air Force on October 14, 2016. Receipt of the claims was acknowledged by the Department of the Air Force on October 25, 2016. More than six months have passed since the filing of these claims. To date, the United States has not made a final disposition, in writing and by certified mail, of the Plaintiffs' claims.

4.3.    Accordingly, pursuant to 28 U.S.C. § 2675(a), Plaintiffs have complied with all jurisdictional prerequisites and conditions prior to the commencement and prosecution of this suit.

4.4.    Plaintiffs' Standard Form 95s administratively presented to the United States on behalf of Blake and Jenna Miller, individually, each stated a "sum certain" of five million three hundred fifty thousand dollars ($5,350,000.00). Plaintiffs' Form 95 administratively presented to the United States by Blake and Jenna Miller on behalf of C.M. stated a "sum certain" of sixty-five million dollars ($65,000,000.00).

## V. FACTS

5.1.    This is a Federal Tort Claim action for monetary damages sustained by Plaintiffs arising out of personal injuries to C.M. as a result of substandard—and therefore negligent—medical and hospital care, including but not limited to: failure to diagnose multiple chorioangiomas; failure to designate Jenna Miller's pregnancy as high-risk; failure to properly monitor for signs of fetal anemia; failure to properly assess, recognize and timely intervene for fetal distress; failure to timely deliver C.M.; failure to transport to an adequate NICU or ensure an adequately equipped resuscitative team was present at delivery; and failure to properly resuscitate C.M. All of these failures individually and collectively proximately caused severe injuries to C.M.

5.2.    Jenna Miller was 23 years old during her pregnancy with C.M., a boy. This was her third pregnancy. She received prenatal care from the Family Medicine Residency Clinic at the Mike O'Callaghan Federal Medical Center (O'Callaghan).

5.3.    During a May 20, 2015, prenatal appointment, Jenna Miller underwent an ultrasound that revealed several masses underlying the placenta that were consistent with chorioangiomas. No fetal abnormalities were charted, but the masses were noted on multiple images. Chorioangiomas are benign masses that can cause fetal anemia and, once diagnosed, the pregnancy should be designated high-risk and followed closely with serial ultrasounds. Such steps were not taken in this case as both Ms. Miller's obstetrician/gynecologist and radiologist failed to diagnose these chorioangiomas. As a result, Ms. Miller and C.M. were never under the care of a maternal-fetal medicine

specialist, the appropriate doctor to handle a high-risk pregnancy and who could have monitored closely for fetal anemia and intervened if necessary. Further, had the pregnancy been designated high risk, providers could have better anticipated C.M.'s needs and arranged for delivery at a facility with Neonatal Intensive Care Unit (NICU) capabilities.

5.4. On September 7, 2015, Jenna Miller presented to O'Callaghan complaining of decreased fetal movement that she had noticed that day. She was 34 weeks, 4 days gestation. Ms. Miller was put on a fetal heart monitor at 1417 hours and tracing showed an immediate bradycardia down to 60 bpm for over two minutes. There was no heart rate variability, no accelerations, and Jenna Miller was feeling no contractions. She was moved to a room at 1425 hours and had a baseline fetal heart rate of approximately 140 bpm with no variability and no accelerations. Orders were given for an IV fluids bolus and Ms. Miller was seen by a nurse at 1429, but was not seen by a doctor, family practice resident Capt. Rowe, until 1524.

5.5. Given gestation and fetal presentation at admission, immediate transport should have been arranged from O'Callaghan to the University Medical Center, which had a NICU, qualified resuscitative team, and was equipped to handle preterm babies. But the medical providers at O'Callaghan missed these signs of fetal distress, causing delay, and continued the course towards delivery in a facility incapable of caring for C.M.

5.6. At 1500, no contractions were present on the monitor. At 1539, the nurse administered oxygen and requested the doctor perform a biophysical profile (BPP), but no further orders were given. By 1611, the baseline fetal heart rate had decreased from

6

140 bpm to 130 bpm, then to 120 bpm, then to 110 bpm with 0 accelerations. Two acoustic stimulations were performed at 1611 but there was no fetal reaction. The nurse again charted that she had received no further orders, but that the doctor would be in shortly to assess the patient.

    5.7.    Obstetrician Capt. Maria V. Zilinski "eventually" performed a BPP. After discussing the results and consulting the attending fetal medicine doctor, the family medicine resident documented non-reassuring fetal heart tracing with a BPP of 4/10 and no fetal movement, then recommended a stat cesarean section. Finally, nursing staff contacted the University Medical Center to arrange for a NICU team to be present for delivery due to gestational age and the low BPP, but it was too late. Due to C.M.'s non-reassuring status, the cesarean section was started before the outside NICU team arrived.

    5.8.    During the cesarean section, there was return of meconium fluid when Ms. Miller's membranes were ruptured. The placenta had four discrete solid masses and the pathology report confirmed six chorioangiomas ranging in size from 3.5 to 10.1 cm. There were also markedly increased nucleated red blood cells, increased stromal cellularity, focal increased syncytial knots, and the entire uterus was slightly levorotated.

    5.9.    C.M. was born on September 7, 2015, at 1706 hours, almost three hours after Ms. Miller had arrived at O'Callaghan. He was delivered unresponsive and pulseless. C.M.'s Apgar scores were 0, 0, 2, and 3. At 1715, his cord blood gases showed:

| | |
|---:|---:|
| Arterial pH | 7.012 |
| $pCO_2$ | 71.7 |
| $pO_2$ | 34.0 |
| Base Excess | -10.0 |
| $HCO_3$ | 18.2 |

| | |
|---:|---:|
| $O_2$ | 38.0 |
| Hematocrit | 10.0% |

**5.10.** At 1720, his venous cord gases showed:

| | |
|---:|---:|
| Venous pH | 7.24 |
| $CO_2$ | 48.1 |
| $PO_2$ | 55.0 |
| Base Excess | -6.0 |
| $HCO_3$ | 20.6 |
| $SO_2$ | 82.0% |
| Hematocrit | 10.0% |

**5.11.** Glucose values were 99 (1713 hours), 55 (1754 hours) and 46 (1820 hours). This complete blood count (CBC) revealed severe anemia and metabolic acidosis, consistent with severe hypoxic-ischemic brain damage.

**5.12.** C.M.'s injuries at birth were then compounded by poor resuscitative care after he was born. A code was called at 1707, one minute after birth, but the outside resuscitative team was not present to respond. CPR was started and continued until 15 minutes of life. At 1710, Dr. Church attempted to secure C.M.'s airway using an endotracheal (ET) tube but could not successfully place the tube. Eventually, an ET tube was placed successfully by Dr. Armstrong at 1714, and an umbilical vessel catheter was placed at 1716, through which epinephrine was administered. At around 8 to 10 minutes of life, C.M. exhibited agonal breathing attempts and at 15 minutes had a carotid pulse and was in sinus rhythm, but sustained respiratory effort was never documented through 70 minutes of life.

**5.13.** At around 1730, 24 minutes after delivery, pediatrician Dr. Burris finally arrived and an IV was placed. Dr. Burris noted that sternal intraosseous infusion had

been attempted but not actually placed, and that C.M. was very pale and not showing spontaneous movements. Capillary blood gas testing revealed pH 6.19, pO$_2$ 36, BE -19, Hct <10%. At 1756, C.M.'s oxygen saturation was noted to have declined. Ongoing prenatal blood loss was evidenced by C.M.'s high nucleated red blood cell count -75 NRBCs/100 WBC.

5.14.    Medical providers found C.M.'s endotracheal tube had slipped back, further compromising C.M.'s oxygenation, so it was pulled back and re-taped. C.M.'s spontaneous movements then returned. Although iSTAT results from cord blood were available much earlier, Dr. Burris was notified of the CBC results revealing hemoglobin of 4.5, hematocrit of 14.9, pH 6.19 with a bicarb of 11—telltale signs of severe anemia and hemorrhagic shock—"just prior" to transfer to the outside NICU.

5.15.    Attempting to place an ill-advised sternal intraosseous line was a waste of time, especially as fundamental resuscitation measures like positive pressure ventilation and epinephrine were delayed. Worse still, because O'Callaghan staff delayed contacting an outside NICU team, the University resuscitative team did not arrive at bedside until 1813, over an hour after C.M. was delivered. By the time the transport team arrived, C.M. had developed severe acidosis secondary to hemorrhagic shock and his brain had been severely and irreversibly damaged.

5.16.    The resuscitative team immediately replaced the existing umbilical venous catheter and inserted an arterial catheter under sterile conditions. Finally, sixty-seven (67) minutes after delivery, C.M. was transported to a facility equipped to handle his care. C.M. was diagnosed with respiratory distress syndrome, 34-week prematurity, anemia,

clinical sepsis, acidosis, and severe perinatal depression. He was given repeated doses of sodium bicarbonate to correct the acidosis, was intubated, and was on a ventilator. Dopamine was administered for his low blood pressure and he was given three transfusions of packed red blood cells (PRBCs) for severe anemia (hemoglobin was down to 3.7 on admission). C.M. received antibiotics due to clinical sepsis, required a fentanyl drip for sedation, and after showing signs of posturing and possible seizure activity, was given phenobarbital. A neurology consultation was ordered.

5.17. Although C.M.'s first head ultrasound on September 7, 2015, was normal, repeat ultrasounds on September 9 and September 16, 2015, showed altered echotexture in both cerebral hemispheres, consistent with diffuse edema and/or sequelae of hypoxic ischemic encephalopathy. EEGs done on September 9 and September 16, 2015, were also abnormal.

5.18. A follow-up MRI done on September 25, 2015, revealed extensive signal abnormality throughout both central hemispheres, consistent with extensive cystic encephalomalacia with associated extensive periventricular leukomalacia and laminar necrosis—sequelae of profound hypoxic ischemic encephalopathy (HIE). Concern for HIE was supported by the head ultrasound findings, the transaminitis, C.M.'s acute renal failure, and brain damage with seizures. The consulting neurologist advised C.M.'s parents that he was at significant risk for moderate to severe problems with: (1) microcephaly; (2) seizure disorder; (3) cerebral palsy; and (4) psychomotor delays/learning disabilities. He was to receive follow-up neurology care and would continue on phenobarbital.

**5.19.** A cardiology consult found some evidence of pulmonary hypertension, systolic murmur, and a "smallish aortic arch." Follow-up evaluation revealed mild pulmonary valve stenosis and patent foramen ovale (PFO) with left-right shunting. Outpatient follow-up was recommended.

**5.20.** A GI consult was done for hyperbilirubinemia. The doctor noted perinatal asphyxia leading to seizures and ischemic liver injury. C.M.'s liver had been damaged not just by the initial ischemic injury, but by exposure to total parenteral nutrition (TPN) for two weeks after birth. Over time, C.M.'s liver function values improved, and his GI specialist anticipated recovery.

**5.21.** As C.M.'s condition stabilized in the NICU, he progressed from TPN to full feeds to working with speech therapy to breast feed. He was diagnosed with respiratory distress syndrome (RDS) but was able to be extubated on September 13 and was weaned to a nasal cannula on September 21, 2015.

**5.22.** C.M. was discharged from University Medical Center on October 13, 2015, after a five-week stay in the hospital. He was doing well with feeding and taking maternal breast milk. Based on the pulmonologist's recommendation, C.M. went home on oxygen due to RDS. His anemia now stabilized, C.M. was discharged with an iron supplement. His parents were given instructions to follow up with C.M.'s pediatrician, pulmonary, neurology, gastroenterology, cardiology, ophthalmology, and Nevada early intervention services/public health nurse for HIE.

**5.23.** After discharge from the NICU, C.M. received physical therapy, occupational therapy, and vision therapy from Nevada Early Intervention Services. Additional therapy

visits were added, as well as a home therapy program, to address C.M.'s severe motor delays and to work on his fine motor skills, visual stimulation, and increasing head control.

5.24. By May 2016, C.M. still needed maximal assistance with basic gross motor activities like rolling over. On July 14, 2016, C.M. had a CT scan of his head and brain that confirmed profound irreversible brain damage suffered in the immediate intrapartum period. He underwent a successful cardiac catheterization for moderate valvar and supravalvar pulmonary stenosis and a stretched PFO. C.M.'s seizure activity continued, and he was kept on Keppra. By July 2016, he was wearing a cranial helmet 22 hours a day for plagiocephaly, glasses and eye patches for visual defects and to increase his ability to turn his head, and he was to start wearing TheraTogs for his poor trunk alignment.

5.25. C.M. suffered two separate oxygen injuries. The first in utero, when his undiagnosed anemia led to anoxic injury, and the second after delivery when his airway was improperly secured, preventing adequate oxygenation. Imaging by ultrasound, MRI, and CT scan confirm bilateral partial prolonged plus profound late preterm hypoxic-ischemic brain injury occurring in the peripartum period.

5.26. C.M. is now three (3) years old. Throughout his young life, C.M. has suffered from microcephaly, seizure disorder, cerebral palsy and psychomotor delays and learning disabilities. He exhibits severe delays in gross and fine motor function, receptive and expressive language, and cognition. He vocalizes but is non-verbal. He is non-ambulatory and unable to sit unsupported and suffers from spastic tetraparesis. C.M. shows signs of epilepsy and has been diagnosed with cortical vision impairment.

**5.27.** The full extent of C.M.'s injuries are not known at this time but are—more likely than not—permanent.

## VI. CAUSE OF ACTION

**6.1.** The Defendant, the United States of America, was negligent in one or more of the following respects:

1. In failing to timely and properly monitor Jenna Miller and C.M.;
2. In failing to timely and properly care for Jenna Miller and C.M.;
3. In failing to timely and properly assess Jenna Miller and C.M.'s medical needs;
4. In failing to timely and properly diagnose Jenna Miller and C.M.;
5. In failing to timely and properly treat Jenna Miller and C.M.;
6. In failing to timely and properly account for subchorionic masses underlying the placenta on Jenna Miller's May 20, 2015, prenatal ultrasound;
7. In failing to timely and properly diagnose subchorionic masses on Jenna Miller's May 20, 2015, prenatal ultrasound as chorioangiomas;
8. In failing to designate Jenna Miller's pregnancy as high-risk, requiring closer monitoring with serial ultrasounds;
9. In failing to properly perform a 32-week ultrasound that would have revealed continuing abnormalities;
10. In failing to timely and properly diagnose fetal anemia;

11. In failing to timely and properly deliver C.M. when Jenna Miller presented to O'Callaghan on September 7, 2015;

12. In failing to timely arrange transfer to an adequate facility; or alternatively, to ensure a physician, pediatrician, or transport team capable of resuscitating high-risk preterm infants was present in the delivery room at the time of C.M.'s birth;

13. In failing to timely and properly perform positive pressure ventilation and to timely administer epinephrine to C.M.; and

14. In failing to timely and properly perform an immediate emergency transfusion with O negative packed red blood cells when C.M.'s cord gas results showed severe anemia and hemorrhagic shock.

**6.2.** At all material times, the employees, agents, or representatives of the United States of America were negligent and proximately caused the injuries sustained by the Plaintiffs.

## VII. DAMAGES

**7.1.** As a proximate result of the Defendant's negligent acts or omissions, C.M. has sustained damages and injuries including, but not limited to:

1. Past and future physical pain and suffering;
2. Past and future mental anguish and mental pain and suffering;
3. Past and future medical, health care and attendant care expenses;
4. Past and future loss of earnings and earning capacity;

    5.      Loss of consortium with his parents, Blake Miller and Jenna Miller;

    6.      Past and future mental impairment and disability;

    7.      Past and future physical impairment and disability;

    8.      Past and future physical disfigurement;

    9.      Loss of years of life expectancy; and

    10.    Other pecuniary damages.

**7.2.** As the parents of C.M., Blake Miller and Jenna Miller, individually, have incurred damages including, but not limited to:

    1.      Past and future mental anguish and mental pain and suffering;

    2.      Past and future medical, health care, and attendant care expenses;

    3.      Loss of consortium with their son, C.M.;

    4.      Loss of earnings;

    5.      Child care expenses;

    6.      Out of pocket expenses; and

    7.      Other pecuniary damages.

**7.3.** In addition, Plaintiffs Blake and Jenna Miller, individually and on behalf of C.M., seek recovery of all other damages to which they are entitled pursuant to the applicable state and federal law(s).

## VIII. COMPLIANCE WITH NRS § 41A.071

**8.1.** While Plaintiffs believe that NRS § 41A.071 is a procedural rule pre-empted by federal procedural rules and not applicable in a FTCA action, out of an abundance of

15

caution Plaintiffs attach as "Exhibit A" an affidavit from a competent medical expert who has practiced in an area substantially similar to the type of negligent medical practice at issue. The affidavit supports the allegations in this Complaint, identifies providers of negligent healthcare, and sets forth specific acts of negligence in concise and direct terms.

## CONCLUSION

Plaintiffs request that Defendant be cited to appear and answer herein: that upon final trial and hearing, the Plaintiffs have a judgment against the Defendant for the amount of actual damages; and for such other and different amounts as they shall show by proper amendment before trial; for post-judgment interest at the applicable legal rate; for all Court costs incurred in this litigation; and for such other and further relief, at law and in equity, both general and special, to which the Plaintiffs may show themselves entitled to and to which the Court finds them deserving.

Respectfully Submitted,

/s/ Jamal K. Alsaffar
**JAMAL K. ALSAFFAR**, *attorney-in-charge*
   Texas State Bar No. 24027193
   S.D. Tex. Bar No. 36130
   jalsaffar@nationaltriallaw.com
**TOM JACOB**
   Texas State Bar No. 24069981
   S.D. Tex. Bar No. 1114402
   tjacob@nationaltriallaw.com
**WHITEHURST, HARKNESS,**
**BREES, CHENG, ALSAFFAR,**
**HIGGINBOTHAM, & JACOB, PLLC**
   7500 Rialto Blvd., Bldg. Two, Ste. 250
   Austin, Texas 78735
   512-476-4346 (o)
   512-476-4400 (f)

Attorneys for the Plaintiffs