## NRS § 41A.071 AFFIDAVIT

BEFORE ME, the undersigned authority, William E. Roberts, M.D., who, being by me duly sworn, testified as follows:

"I am a medical doctor and am licensed to practice medicine in the State of Tennessee. My specialty is obstetrics and gynecology with subspecialty training in maternal-fetal medicine. I have taught obstetrics and gynecology since 1984 and have authored or co-authored at least 103 abstracts, 84 journal articles, 18 book chapters, and 2 books in the field of obstetrics and gynecology and maternal-fetal medicine.

I am familiar with cases like this by virtue of my education, training, knowledge, and experience. I have practiced in an area that is substantially similar to the type of practice engaged in at the times of alleged negligence. I have seen, evaluated, and treated many patients like Jenna Miller, and I am familiar with the standard of care of obstetrics and maternal-fetal medicine during the time period encompassed in the instant case of Jenna Miller's treatment and care.

This affidavit is executed pursuant to NRS § 41A.071 in support of Plaintiffs' Original Complaint for medical malpractice against the United States of America, its officers, agents, employees, and representatives at the Family Medicine Residency Clinic at the Mike O'Callaghan Federal Medical Center (MOFMC).

I have formed the following medical opinions, all within a reasonable degree of medical probability. Based upon my review of the medical records, including daily notes, progress notes, physician orders, and ultrasound images, and the Opinion letter of Randall M. Patton, M.D., P.S., it is my medical opinion that the obstetric ultrasound Jenna Miller received on May 20, 2015, and reviewed by Dr. Baxter Tharlin, deviated from the standard of care by failing to note

multiple sub-chorionic masses in the area of the placenta. As a result, a detailed ultrasound examination was not obtained that would have confirmed the placental masses to be chorioangiomas. As a result, this high-risk pregnancy was not afforded the serial ultrasound examinations necessary to follow fetal growth in conjunction with Doppler interrogation of the middle cerebral artery to detect fetal anemia. Unknown to the providers, C.M. developed severe fetal anemia.

Due to the negligent May 2015 ultrasound, the pregnancy was not designated high-risk, and progressed to preterm delivery on September 7, 2015. Dr. Mark Rowe and Nurse Fitzgerald failed to recognize that Jenna Miller needed admission and probable delivery. The facility did not have a neonatal intensive care unit (NICU) and medical providers did not arrange for transfer to the University Medical Center (UMC), a facility equipped to care for a preterm, severely anemic, asphyxiated newborn.

C.M. was delivered in a compromised condition at a facility ill-equipped to provide appropriate care after delivery. His injuries at birth were then compounded by poor resuscitative care after he was born. Basic resuscitative measures like placing an endotracheal tube required multiple attempts, time was wasted placing an ill-advised sternal intraosseous line, and fundamental resuscitation measures like positive pressure ventilation and epinephrine were delayed. The care provided at MOFMC was substandard compared to that provided by the NICU team at UMC where C.M. was eventually transferred over an hour after his birth.

C.M.'s complete blood count revealed severe anemia and metabolic acidosis, consistent with severe hypoxic-ischemic injury. Due to perinatal asphyxia, C.M. suffered neonatal encephalopathy and now has cerebral palsy with accompanying neurological deficits.

This series of events should and could have been prevented if Dr. Tharlin had adhered to the standard of care when reviewing the obstetric ultrasound images of Jenna Miller that were obtained on May 20, 2015. The chorioangiomas and fetal anemia should have been diagnosed, and C.M. would have been delivered at a facility prepared for neonatal resuscitation and rapid transfusion therapy. As a result, C.M., more likely than not, would not have been born asphyxiated, would not have suffered neonatal encephalopathy, and would not have permanent neurologic injuries.

If Dr. Rowe and Nurse Fitzgerald had complied with the acceptable level of care and foreseen that Jenna Miller, shortly after her presentation to MOFMC, needed admission and probable delivery, Jenna Miller would have been timely transferred to UMC. As UMC is capable of providing the level of care needed by a compromised preterm infant, more likely than not, C.M. would not have been asphyxiated at birth, would not have suffered subsequent neonatal encephalopathy, and would not have permanent neurological injuries.

It is my opinion, to a reasonable degree of medical probability, that the prenatal care and treatment provided to Jenna Miller and C.M. as well as the care and treatment provided during labor and delivery on September 7, 2015, and immediately following delivery when the baby was being resuscitated, were below the standard of care in the following respects: failure to diagnose multiple chorioangiomas; failure to designate Jenna Miller's pregnancy as high-risk; failure to properly monitor for signs of fetal anemia; failure to properly assess, recognize and timely intervene for fetal distress; failure to timely deliver C.M.; failure to transport to an adequate NICU or ensure an adequately equipped resuscitative team was present at delivery; and failure to properly resuscitate C.M. All of these failures individually and collectively proximately

caused severe and permanent neurological injuries to C.M., including his Cerebral Palsy and its sequalae.

The information contained herein is true and correct to the best of my knowledge. I reserve the right to supplement my opinions in the event new information becomes available.

FURTHER AFFIANT SAYETH NOT."

William E. Roberts, M.D.

SWORN TO AND SUBSCRIBED BEFORE ME on this 11th day of February, 2019.

Notary Public in and for the State of Tennessee

My Commission Expires
December 13, 2022

(SEAL)